**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **CATARINA ANCISCO** | § | |
| **MONTEMAYOR, INDIVIDUALLY,** | § | |
| **AND AS THE PERSONAL** | § | |
| **REPRESENTATIVE OF THE** | § | |
| **ESTATE OF ANTONIO** | § | |
| **MONTEMAYOR** | § | |
|     *Plaintiff* | § | |
| | § | **CIVIL ACTION NO. 1:24-cv-00077** |
| | § | |
| **vs.** | § | |
| | § | |
| **THE TORO COMPANY;** | § | |
| **TORO MANUFACTURING LLC; and** | § | |
| **LOWE'S COMPANIES, INC.** | § | |
|     *Defendants* | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

    **COME NOW,** CATARINA ANCISO MONTEMAYOR, INDIVIDUALLY, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ANTONIO MONTEMAYOR (hereinafter, referred to collectively as "Plaintiffs"), in the above-styled and numbered Cause, and file this *Plaintiffs' First Amended Complaint* against THE TORO COMPANY, TORO MANUFACTURING LLC and LOWE'S COMPANIES, INC., (hereinafter, referred to collectively as "Defendants") and in support thereof, would respectfully show the Court the following:

### I.

### PARTIES AND SERVICE

1.1    Plaintiff Catarina Anciso Montemayor, Individually and as Representative of the Estate of Antonio Montemayor is a resident of Cameron County, Texas.

1.2    Defendant The Toro Company is a domestic company doing business in the state of Texas. Defendant The Toro Company has appeared in this Cause by and through its Counsel of record.

1.3    Defendant Toro Manufacturing LLC is a domestic company doing business in the state of Texas. Defendant Toro Manufacturing LLC has appeared and answered through its Counsel of record.

1.4    Defendant Lowe's Companies, Inc. is a domestic company doing business in the state of Texas. Defendant Lowe's Companies, Inc. has appeared and answered through its Counsel of record.

## II.

## JURISDICTION AND VENUE

2.1    Jurisdiction in this case is proper under 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.2    Venue is proper in the Southern District of Texas, Brownsville Division, pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events, acts and/or omissions giving rise to the claim occurred in this District.

## III.

## FACTS

3.1    On or about July 10, 2022, at approximately 5:22 p.m., Decedent Antonio Montemayor, a 65-year-old male of 16130 Odom Lane, Harlingen, Texas, was found deceased under the rear of his running riding lawnmower in the front yard of his home located at 16130 Odom Lane, Harlingen, Texas. Mr. Montemayor was trapped under the rear of the mower in the engine and

rear drive wheel area, and the mower's rear tire had made marks on Mr. Montemayor and the lawn showing it had been rotating in reverse for some time.  Mr. Montemayor had significant burn marks on his chest and neck from prolonged contact with the running engine's muffler on top of him on or about July 10, 2022.  Mr. Montemayor was pronounced dead at the scene.  The lawnmower in question was designed and manufactured by Defendants The Toro Company and Toro Manufacturing LLC, hereinafter collectively (the Toro Defendants and/or Toro).

3.2    As a result of the lawnmower's malfunction, said lawnmower ran over the decedent Antonio Montemayor.

3.3    The lawnmower's malfunction, was a direct, producing and proximate cause of the accident, the severe injuries to the Plaintiffs, the severe injuries and death of Antonio Montemayor, and the damages of all Plaintiffs.

3.4    The Toro Company and Toro Manufacturing LLC's, manufacturing and marketing defects caused Plaintiffs' injuries, to include the severe injuries and death of Antonio Montemayor, and the damages of all Plaintiffs.

3.5    Mr. Montemayor was using a Toro "TimeCutter SS 5000 Riding Mower" zero turn mower, Model Number 74631 and Serial Number 313004100.  The Serial Number starting with "313" identified this as a mower manufactured in 2013.  According to the labels on the mower, it was manufactured by The Toro Company, 8111 Lyndale Avenue South in Bloomington, Minnesota.  The labels indicated that Toro certified that the mower met "ANSI B71.1-2003 Requirements" when it was manufactured and sold.  The mower's Operator's Manual stated, "This machine meets or exceeds the B71.1-2003 specifications of the American National Standards Institute, in effect at the time of production."

3.6    The manual also stated that the mower was intended to be used by homeowners in

residential applications and was "primarily designed for cutting grass on well-maintained lawns," which is what Mr. Montemayor was doing at the time of his death.  Mr. Montemayor's lawn was well-kept, and the lawn area involved in the incident was flat.  Scene photos show that Mr. Montemayor had completed the mowing on most of the visible lawn in long, straight rows.  The area of the incident was flat and was at the beginning of one of the straight rows.  The day was sunny, and the time of the incident was middle to late afternoon with good visibility.  No obstacles or depressions were visible in the lawn.

3.7     The subject mower utilized a version of an "automatic" parking brake function.  This is contrasted with a "manual" parking brake function, where the operator actuates the parking brake via pulling a handle, pushing a pedal, etc.  Many similar mower makes and models, including other similar Toro models manufactured before, during, and after the subject model including currently-available mowers, utilized versions of a "manual" parking brake.   This includes the Toro "TimeCutter HD" models, shown in in the figures below, taken from the Toro Operator's Manual for those models, which use a manual parking brake.  The current Toro "Titan" zero turn mowers also use a manual parking brake lever:



## Parking-Brake Lever

The parking-brake lever is located on left side of the console (Figure 5).  The brake lever engages a parking brake on the drive wheels.

To engage the parking brake, pull up the lever until it latches into the detent slot.

To disengage the parking brake, pull the lever out of the detent slot and toward you, then push it down.

3.8     The subject Toro model used a system where if both steering levers were placed by the operator into their "park" positions, an electric actuator motor integrated with the Toro brake controller module would move levers that were attached to linkages that were then attached to

parking brake mechanisms that would engage into gears on the drive wheel axles to lock them. Certain electrical devices, including the switches on the levers, the controller box, and the electric actuator motor, had to be working correctly to apply the parking brakes.  Mr. Montemayor's mower had no way to "manually" apply a parking brake – it relied on the Toro design and manufactured switches, brake controller, actuator, linkages, and brake devices to apply the parking brake.

3.9    The subject mower model's parking brake function had no indicator to know if the machine's parking brake was applied.  On the other Toro contemporary models and other manufacturers' models with a lever or pedal, these would show if the brake was properly applied by the position of the lever or pedal.  Mr. Montemayor's mower had no way to see or confirm that the parking brake was applied, other than looking under the mower.

3.10    The subject mower's Operator's Manual did not explain the parking brake function anywhere in the "Controls" section at the front of the manual.  In the Manual's "Pushing the Machine by Hand" section several sections later, the instructions explain how to go about attempting to disengage the brakes but instruct the operator to "Refer to the Releasing the Electric Brake procedure in Drive Maintenance" if the brakes do not disengage.

3.11    In the "Releasing the Electric Brake" section in the "Drive System Maintenance" (not "Drive Maintenance" as referred to in the referencing section) the instructions tell the operator to manually rotate the link arms forward to release the electric brake.  The only way to perform this operation is to reach up from under the mower to access these link arms that are located under the engine.  However, the figure does not show the mower deck and blade drive belt in place below the actuator, which hinders access to the link arms from the direction shown.

3.12    The subject Toro parking brake system used a plunger switch at each control lever that was depressed by placing the control lever into its "park" position.  The lever had to be moved into

their center "neutral" positions and then additionally into their center outward "park" positions. The operator was required to move the levers to the "park" position – there was no automatic function for this.

3.13    The design of this subject mower did have a spring in the control mechanism to provide resistance to the controls when the operator was pulling them rearward to operate the mower in reverse.  This design provided a spring return force toward the neutral position from the control levers being pulled rearward, but this design did not return the levers to the "park" position.  This defective design had no spring return from the forward position of the levers.

3.14    The subject mower Mr. Montemayor was using did not have this reverse resistance spring on either control lever.  The design only retained these springs by having them somewhat "caught" in place against their own spring force in the controls bracket.  The bottom of this bracket is open to the ground, so if the springs weaken and/or the mower is jostled these springs will fall out. Nothing retained these springs except friction.  And, when the springs fall out, the operator is not in a position to notice they are missing since they cannot be seen and only a slight change in the resistance of the reverse control pull force occurs.

3.15    Once the levers were placed in the outward "park" positions, the plunger switches were supposed to close and provide a 12-volt signal to the Toro brake controller module.  This module was then supposed to activate the actuator to engage the parking brake mechanisms if everything was working correctly.  These switches were only held in place by a plastic clip, and in the case of the subject mower, come loose causing the switch to misalign and not properly detect the "park" position of the lever.

3.16    ANSI B71.1-2003 section 14.2.3.2 *Parking Brake* describes the requirements for the operation of the parking brake on mowers like the subject mower.  Subsection 14.2.3.2.4 states

"*An automatically operated parking brake, when provided, shall be actuated when the operator presence control is released.*"

3.17    On the subject mower, the control levers are the applicable "operator presence controls" for the parking brake function.  With no springs or spring functions, releasing the control levers simply allowed the levers to stay in the position they were in.  There were no springs or features that moved the levers to the "park" position or applied the "parking brake" when the levers were released.  Therefore, Subsection 14.2.3.2.4 of ANSI B71.1-2.3 was not complied with in the design of the subject mower model and Toro was in violation of such design requirements.

3.18    Additionally, there were no springs or retaining devices that held the levers in the "park" position on the subject mower once they were placed there.  On other industry standard makes and models of similar mowers, the "manual" park brake levers, pedals, etc. had a catch mechanism or holding function that required an intentional actuation by the operator to release the parking brake.  The subject mower's levers, when placed into their "park" position, had no retaining mechanism to keep them firmly in the "park" position.  The only force that kept them in the "park" position was gravity.  If the mower was not on a level surface a lever can "fall" out of its "park" position.  If the mower moved, was bumped, or was shaken a lever can bounce out of its "park" position.  Accidentally bumping the lever would move it off the "park" position detecting switch rendering the subject mower to be unreasonably dangerous.

3.19    The levers and brackets were constructed of carbon steel, so when the paint or coating wore or chipped off, rust would naturally occur.  This rust caused a resistance in pivoting the levers, causing them to "hang up" or not fully seat down to fully depress the switch plunger.  The lever pivots were made of an aluminum alloy which is not prone to rust like steel, but did show rough white corrosion on them that affects the pivoting of the levers.  This made it so that the levers

would not simply automatically fall into the "park" position; the operator, such as Mr. Montemayor, would be required to push them into this position and still not have any indication that they were both fully in the "park" positions or that the parking brake had engaged.

3.20    The Toro parking brake design on the subject mower disengaged both wheels' brakes even if only one lever moved off its position switch. Testing showed that the mounting method of the switches allowed a switch to detect that the lever was out of its "park" position when it was only slightly moved from this position. So, it would not be unusual for a slight bump or shift of a single control lever to disengage the entire parking brake function. It would also not be unusual for a lever to not fully engage a switch even when the levers were placed into the "park" position, which would result in the parking brake never applying.

3.21    The Toro design disengaged both parking brakes whenever the mower's key was in the "ON" position and either one of the lever switches was not detecting a "park" position of the control lever. There was no way for an operator to engage the parking brake manually.

3.22    The drive system of the mower used two hydrostatic transmissions, each attached directly to a rear drive tire. The system used a left transmission to drive the left tire and a right transmission to drive the right tire. These transmissions were driven directly by the mower's engine, so any time the engine was running the motors had drive power.

3.23    A hydrostatic transmission is a self-contained unit consisting of a hydraulic pump (driven by the mower's engine) and a hydraulic motor that is attached to the mower's tire. A hydrostatic transmission is not like a geared transmission that shifts sets of gears to adjust the speed and direction. A hydrostatic transmission internally adjusts the flow of hydraulic fluid between the pump and motor to continuously adjust the output speed and direction. This adjustment of flow is controlled by an input shaft on the transmission that is rotated to increase or decrease the output

speed and change the rotational direction of the output.  On the subject mower, the control levers were attached with linkages to the corresponding transmission's input shaft.  Moving a lever forward made that side's drive tire rotate forward, and increasing the amount the lever was pushed forward increased the speed of the tire.  Moving the lever rearward made that side's tire move in reverse, and increasing the amount the lever was moved rearward increased the reverse speed.

3.24    The use of hydrostatic transmissions in commercially-available riding mowers dates back to the 1960's.  Commercially-available "zero turn radius", "zero radius turn", "zero turn", or "ZTR" mowers with hydrostatic transmissions were introduced in the 1970s.  Hydrostatic transmissions in zero turn mowers, like the subject mower, have been common since the 1980s.  Almost all zero turn mowers since the 1990s by all manufacturers have used hydrostatic transmissions.  The current sales of zero turn mowers are about 1 million units annually, with about 1/4 of those sold in the U.S.

3.25    The design of the subject mower is such that if the gears do not mesh when the actuator strokes, i.e. the teeth align on top of one another, the brake will not apply because the teeth are not engaged with one another.  The actuator can move the rod but the brake device does not engage, so the front spring simply compresses.  The design parameter is that the spring will engage the brake device by application of this spring pressure if the axle rotates enough that the teeth will align.

3.26    However, if the device is obstructed by grass, sticks, or debris it may not engage the brake.  If the device binds up on its pivot, it may not engage.  If the linkage slider mechanism binds up, the brake is susceptible to not engaging.

3.27    The brake may not disengage when the actuator moves the linkage rod which can lead to wear around the diameter of the linkage rod where it passes through the brake device slider.  This

wear is indicative of the actuator pulling the rod to attempt to disengage the brake, but the device staying engaged. This is due to the load on the brake device by the gear on the axle causing them to stay bound together. The brake will not disengage until this binding is relieved. In the mower's Operator's Manual in the section Pushing the Machine by Hand instructions are given on how to release the electric parking brake. In this section Toro provided a statement, "If the machine fails to move the electric brake may still be engaged. If necessary the electric brake can be released manually. The Toro instructions are given to reach under the machine and rotate the arms on the brake module by hand.

3.28    Toro provides no instructions to address the issue of the brake device not engaging the gear or the brake device not disengaging from the gear. However, there are many videos on social media platforms and instructions on discussion forums related to how to manually disengage the gears if they are stuck or remove the brake devices if they repeatedly jam and get stuck, not allowing the mower to drive. Many of the presenters in these videos and many of the participants in the forum discussions were mower service technicians and/or mower service professionals.

3.29    Shortly after Toro released this Brake Control Module in 2011, they produced a video titled "TimeCutter Z Brake Control Module". This video and another video about the control module has been removed from YouTube, but it is still accessible under a third party's account as: "TimeCutter SS – Brake Control Module (Troubleshooting)". In the video, the Toro representative explains that the module is not serviceable and is replaced as a complete assembly. The video explains and shows the operation of the actuator arms of the module acting on the brake device at the hydrostatic transmission through the linkage rod. The video depicts the teeth on the brake device engaging and disengaging into the teeth on the axle gear.

3.30    The video explains that the module has "two internal magnetic switches that monitor the

position of the brake motor.  If the brake arm fails to make full travel, the system will shut down and ground the ignition.  It can be reset by simply turning the key switch off and on, or by moving the control arms in and out of neutral, and that will reset the brake control module."

3.31    The video continues, "As we'll see, troubleshooting is just a matter of checking inputs and outputs," referring to the inputs and outputs of the Brake Control Module.  The video explains that the module is connected to constant 12-volt battery power and ground, and explains the various circuit inputs from the key, switches, etc.

3.32    The video incorrectly states that "…if the two motion control handles are moved to the operating position, the controller will disengage the parking brake."  Only one of the control handles needs to be moved out of the park position for the controller to disengage the parking brake.  The video also shows how to manually disengage the parking brake by reaching up under the mower and pulling on the brake linkage rods to disengage the brake devices.

3.33    The video does not explain the operation of the starter solenoid relay and that it only functions if the Brake Control Module provides a ground to it.  The video demonstrates that turning the key switch to the "start" position energizes the solenoid to cause the engine's starter to crank and start the engine if the correct interlock switches are closed.  But this is only true if the module has provided ground to the starter solenoid.  In other words, the video does not properly explain how the starter solenoid is grounded to allow the engine to start.  Normally, starter solenoids are grounded to the chassis or directly to the battery.  Troubleshooting a starting issue would intuitively involve checking that the ground terminal of the solenoid is connected to and/or has continuity to the battery's negative terminal and that the solenoid gets 12-volt power when the key is turned to the "start" position.  The Toro design sources the solenoid ground through the Brake Control Module which connects the ground only in certain conditions, so checking for ground while

troubleshooting a starting issue would be more complicated and unintuitive. Said video shows Toro's knowledge of the design defect and knowledge of an alternative design. All of the preceding design defects resulted in the death and was the producing cause of Mr. Montemayor's death.

## IV.

### STRICT LIABILITY CAUSE OF ACTION AGAINST THE TORO COMPANY AND TORO MANUFACTURING LLC

4.1     The subject lawnmower was originally designed, manufactured, sold and/or placed into the stream of commerce by The Toro Company and Toro Manufacturing LLC (collectively The Toro Defendants). Said lawnmower was defectively designed so as to render it unreasonably dangerous; a safer alternative design existed; and the defect was a producing cause of the injury to the Plaintiffs and for which they seek recovery.

4.2     At the time of the sale of the lawnmower in question, The Toro Company and Toro Manufacturing LLC were in the business of designing, manufacturing and selling riding lawnmowers such as the lawnmower in question.

4.3     At the time the riding lawnmower in question was designed, manufactured, sold and/or placed into the stream of commerce by The Toro Company and Toro Manufacturing LLC, the same was defective and unreasonably dangerous in its design, marketing and manufacture.

4.4     These defective and unreasonably dangerous conditions were a producing cause of the accident made the basis of this suit, the injuries to Plaintiffs, the severe injuries to Catarina Anciso Montemayor and the severe injuries which lead to the death of Antonio Montemayor, and the damages sustained by the Plaintiffs.

4.5     Aside from normal wear and tear, the subject riding lawnmower was in the same defective condition at the time of the accident as it was when it left the hands of the Toro Defendants.

4.6    The subject riding lawnmower was expected to and in fact reached the user or consumer without substantial change in the condition in which it was sold.

4.7    Technologically and economically feasible safer alternative designs existed that would have prevented or significantly reduced the risk of injury without substantially impairing the utility of the product.

4.8    Applicable safety standards issued by the Federal Government or any other agency or group, if any, were inadequate to protect the public from unreasonable risks of injury or damage and The Toro Defendants have withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations set at issue in this action.

4.9    The subject lawnmower deviated in its construction or quality, from the specifications or planned output in a manner that rendered it unreasonably dangerous.  Particularly, Toro failed to manufacture its product in a matter to meet the safety requirements for the parking brake function consistent with the American National Standards Institute standard (ANSI) B71.1-2003 as claimed by Toro in the product manual and on the label on the mower.

4.10    There was a risk of harm inherent in the subject lawnmower or which may arise from the intended or reasonably anticipated use of the subject lawnmower; the Toro Defendants actually knew or should have reasonably foreseen the risk of harm at the time that subject lawnmower was marketed; the subject lawnmower contained a marketing defect; and the absence of warnings rendered the product unreasonably dangerous to Mr. Montemayor; and the Toro Defendants failure to warn constituted a causative nexus in the death of injuries and eventual death of Mr. Montemayor.

4.11    More specifically, after the inspection of the lawnmower in question, the inspection

revealed and showed that:

    a.   Mr. Montemayor was using the subject Toro riding lawn mower properly and as the manufacturer intended.

    b.   Mr. Montemayor had maintained the mower in reasonably good operating condition.

    c.   Mr. Montemayor had not purposely modified the mower in a way intending to bypass any of the mower's safety features.

    d.   The design and manufacture of the mower, its electrical system, its controls, and its automatic park brake function was the responsibility of The Toro Company and Toro Manufacturing LLC.

    e.   There was no way for Mr. Montemayor to manually apply the parking brake on the subject mower.

    f.   There was no indicator on the subject mower for an operator like Mr. Montemayor to know that the parking brake was engaged or disengaged.

    g.   Other mower models manufactured by the Toro Defendants before, concurrent with, and since the subject mower was designed and manufactured utilized parking brake systems with a visual indicator and a positive locking function.

    h.   Other manufacturers designed and sold mowers before, concurrent with, and since the subject mower was designed and manufactured that utilized parking brake systems with a visual indicator and a positive locking function.

    i.   The subject automatic parking brake function was complex and utilized many parts that all had to work in order for the parking brake to properly engage. Evidence shows that this system was not reliable, had many complaints of operating problems, and was difficult and expensive to service and maintain.

    j.   The subject mower model did not meet the safety requirements for the parking brake function consistent with the American National Standards Institute standard (ANSI) B71.1-2003 as claimed by Toro in the product manual and on the label on the mower. This safety standard required the parking brake to operate automatically when the operator released the control levers, but the subject mower required that the operator place the levers into the park position manually.

    k.   The design of the subject mower's control lever park position detecting switches and their installation was not reliable and robust enough to allow the system to function properly

<u>**PLAINTIFFS' FIRST AMENDED COMPLAINT**</u>– Page 14

after the mower had been in use.  Other designs before, concurrent with, and since the design and manufacture of the subject mower model utilized more reliable designs.

l.   Components of the control lever system related to the automatic return of the control levers to a neutral and/or park position were not designed with a reliable enough design to function after the mower had been in use.

m.  The Toro Company and Toro Manufacturing LLC had designed and manufactured tens of thousands, if not hundreds of thousands of mowers or more, when they designed and manufactured the subject mower.  They would have or should have known and understood the working conditions, mower safety standards, effective operator safety, reliability of components, and design of mowers for reliably safe operation.

n.  The design of the subject parking brake system allowed it to function unintuitively, with confusing operation and difficulty troubleshooting it.  The design allowed the system to engage the parking brake unexpectedly, requiring the operator to reach underneath the mower to release it.

o.  Shortly after releasing this system in 2011, The Toro Company and Toro Manufacturing LLC  released a video explaining how to troubleshoot the system.  The video contained incorrect information and also did not explain some critical differences in this new system compared to the other systems that had been in use for many years.  The video did not provide proper information about the system or how to properly troubleshoot it, resulting in improper service.

p.  The position of Mr. Montemayor at the scene and the physical evidence indicates that he was behind the mower looking under the rear of it or working under the rear of it when its left rear tire started driving in reverse, eventually overrunning and pinning Mr. Montemayor.  The left tire of the mower continued to drive in reverse, spinning on the lawn adjacent to Mr. Montemayor's head while the engine's muffler compressed and burned into Mr. Montemayor's chest with the weight of the mower.

q.  The starter solenoid on the mower had been replaced prior to the incident and the engine shroud had been modified at the starter, indicating that the mower's starting system had been worked on.  This is consistent with issues associated with the automatic parking brake Brake Control Module.

r.  The design and manufacture of the Brake Control Module, the mower, and the subject mower's electrical system caused electrical issues that resulted in unexpected operation and no-start conditions in the mower.

s.  Troubleshooting these issues using normal processes revealed an apparent loss of ground continuity to the starter solenoid, solved by adding a short wire from the battery to the solenoid.  Due to the design of the mower, this modification would not have caused any apparent unexpected operation of the mower.

t.  Only a detailed process of testing the functionality of the mower's safety interlocks would have revealed the improper functioning of the safety systems of the mower.  The improper functioning of the safety systems did not affect the operation, starting, stopping, or mowing productivity of the mower.  It is known that safety systems such as interlocks that, when failed or operating improperly, do not affect the operation of a machine, its productivity, or its functionality are not likely to be repaired or replaced.

u.  The design of the mower used instructions for the operator to test the interlock system.  With the mower appearing to function properly, the operator would not be motivated to check these procedures or even look them up in the manual.  Most operators do not know these procedures exist.  The design of the mower used minimally effective measures for its safety interlock system compared to using engineered design solutions with greater safety effectiveness.

v.  The design of the parking brake safety system was susceptible to a single component failure causing the safety system to not function properly and not provide the operator with any sign that it wasn't functioning properly.  This is an improper design for safety systems.

w.  There was no evidence that the Brake Control Module had been replaced since the mower was manufactured.  The plug not fully engaged and locked onto module's receptacle represented a manufacturing defect.

x.  The incident that caused Mr. Montemayor's death was due to design and manufacturing defects in the subject mower.

## V.

## NEGLIGENCE OF THE TORO COMPANY AND TORO MANUFACTURING LLC

5.1    The Toro Company and Toro Manufacturing LLC committed unreasonable acts of omission and commission, which, collectively and severally, constitute negligence.  Such negligence was a direct, producing and proximate cause of the accident and injuries to Plaintiffs, to include the severe injuries of Plaintiff Catarina Anciso Montemayor and the severe injuries which lead to the death of Antonio Montemayor, and of all of the Plaintiffs' injuries and damages.

5.2     Among other acts of negligence, The Toro Defendants were negligent in:

     a.     failing to adequately design the subject riding lawnmower;

     b.     failing to adequately test the subject riding lawnmower;

     c.     failing to manufacture the subject riding lawnmower to its specification;

     d.     failing to institute, execute and maintain adequate quality control and quality assurance processes and procedures;

     e.     manufacturing the subject riding lawnmower with contaminants in its components;

     f.     failing to inspect the subject riding lawnmower latent defects in its manufacture;

     g.     failing to incorporate safety features in the subject riding lawnmower and other devices that can reduce or eliminate the riding lawnmower's propensity to malfunction and run over persons;

     h.     using aged, dry and/or otherwise deteriorated or off-spec materials in the construction of the subject riding lawnmower;

     i.     failing to design and manufacture the riding lawnmower;

     j.     failing to adequately collect and analyze loss adjustment data, warranty data, claims, and lawsuits that may reveal that the subject riding lawnmower models perform more poorly than other riding lawnmower lines that incorporate safety features or alternative safer designs not present in the subject riding lawnmower;

     k.     failing to provide adequate warnings and instructions for the safe use of the product;

     l.     failing to assure riding lawnmower quality in conformance with standards; and

     m.     other acts and/or omissions constituting negligence.

5.3     The Toro Defendants' negligence was a proximate cause of the accident made the basis of this suit, the severe injuries to Plaintiffs and the severe injuries which lead to the death of Antonio Montemayor, and the damages sustained by all Plaintiffs.

5.4     Each of the above-described failures separately and when taken together, rendered the riding lawnmower defective from a design, manufacture, and marketing standpoint as those terms are defined under Texas law.

## VI.

### <u>BREACH OF IMPLIED WARRANTIES</u>
### <u>AGAINST THE TORO COMPANY AND TORO MANUFACTURING LLC</u>

6.1     At all times relevant to the complaint, The Toro Company and Toro Manufacturing LLC were a merchant in the business of supplying goods, namely lawnmowers.

6.2     The subject riding lawnmower was a good and/or product sold for consumer usage.

6.3     The Toro Defendants breached the implied warranties of merchantability and fitness for a particular purpose in that the subject riding lawnmower was not fit for ordinary use or for the intended use for which it was purchased, including for each and every reason set forth in Section 5.2 above.

6.4     These breaches of implied warranty were a proximate cause of the accident made the basis of this suit, the injuries to all Plaintiffs  and the severe injuries, which lead to the death of Antonio Montemayor, and the damages sustained by the Plaintiffs.

## VII.

### <u>BREACH OF EXPRESS WARRANTIES</u>
### <u>AGAINST THE TORO COMPANY AND TORO MANUFACTURING LLC</u>

7.1     Plaintiffs refer to each and every preceding paragraph and incorporate those paragraphs as though fully stated herein.

7.2     Alternatively, and without waiving the forgoing, Defendants The Toro Company and Toro Manufacturing LLC expressly warranted that the subject riding lawnmower was safe and effective for its intended and/or reasonably foreseeable use.

7.3     The subject riding lawnmower failed to conform to these express warranties as it caused and continues to cause serious injury to its users when used as intended and/or in a reasonably foreseeable manner.

7.4     Decedent Antonio Montemayor, as an intended user of the subject riding lawnmower relied on the express warranties by Defendants The Toro Company and Toro Manufacturing LLC in using the riding lawnmower.

7.5     As a direct and proximate result of the breach of the express warranties by The Toro Defendants, Plaintiffs suffered injuries as a result of the death of Antonio Montemayor.  The breach of express warranties was a substantial factor in causing the injuries to Plaintiffs as described herein.

## VIII.

## NEGLIGENCE OF LOWE'S COMPANIES, INC.

8.1     Upon information and belief, Defendant Lowe's Companies, Inc. was the seller of the defective Toro "TimeCutter SS 5000 Riding Mower" zero turn mower, Model Number 74631 and Serial Number 313004100, and as the seller of a defective product, Lowe's Companies, Inc. is liable to Plaintiffs for all damages sustained to Plaintiffs resulting from the use of the defective product.

## IX.

## CAUSE OF ACTION – GROSS NEGLIGENCE

9.1     At all material times hereto, Defendants acted with heedless, reckless and conscious disregard for the rights of others, including those of Plaintiffs and the public at large and as such the acts committed by Defendants were committed with malice and/or gross negligence referred to in Section 41.001 of the Texas Civil Practice & Remedies Code.  *See*, Tex. Civ. Prac. & Rem. Code §41.001.  Such gross negligence constitutes a proximate and producing cause of Plaintiffs' damages, and exemplary damages should be assessed against Defendants.

## X.

## COMPENSATORY DAMAGES

10.1    As a producing, direct and proximate result of the incident, injuries, and damages for which Defendants are liable, the Plaintiffs seek and are entitled to general, special, economic and noneconomic, wrongful death and survival damages, as applicable to the Plaintiffs, in an amount in excess of the minimum jurisdictional limits of the court, as determined to be just and fair by the jury.  Such damages include, but are not necessarily limited to:

    a.    *Wrongful Death Damages*

        (1)    pecuniary loss in the past and future;

        (2)    loss of consortium, companionship and society in the past and future;

        (3)    mental anguish in the past and future;

        (4)    loss of inheritance;

        (5)    loss of community estate and addition to estate;

        (6)    all other damages allowed by law and equity.

    b.    *Survival Damages*

        (1)    pain and mental anguish;

        (2)    medical expenses;

        (3)    funeral and burial expenses; and

        (4)    all other damages allowed by law and equity.

    c.    *Personal Injury Damages*

        (1)    physical pain and mental anguish in the past and future;

        (2)    loss of earning capacity in the past and future;

        (3)    loss of wages and earnings in the past and future;

        (4)    disfigurement in the past and future;

      (5)     physical impairment in the past and future;

      (6)     medical care in the past; and

      (7)     all other damages allowed by law and equity.

      *d.*     *Bystander Damages*

Plaintiff Catarina Anciso Montemayor witnessed the horrific injuries suffered by her husband Antonio Montemayor.  As a direct and proximate result of her contemporaneous, sensory observance of her husband's injuries, Plaintiff Catarina Anciso Montemayor suffered shock from the direct emotional impact of the injury to her husband.  Thus, Plaintiff Catarina Anciso Montemayor seeks damages for her bystander claim in excess of the minimum jurisdictional limits of this Court.

10.2    The damages sought are greatly in excess of the minimum jurisdictional limits of the court.

## XI.
## <u>EXEMPLARY DAMAGES</u>

11.1    Plaintiffs seek exemplary damages for personal injuries caused by Defendants' gross negligence under Texas Civil Practice and Remedies Code Section 41.003 (a)(3), as defined by Section 41.001, as well as Article 26 of the Texas Constitution.  *See*, Tex. Civ. Prac. & Rem. Code §41.003(a)(3); Tex. Const. Art. 26.  Defendants' acts or omissions described above, when viewed objectively from the standpoint of Defendants at the time of the acts and/or omissions, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiffs and others.

11.2    Defendants had actual, subjective awareness of the risks involved in the above-described acts and/or omissions, but nevertheless proceeded with conscious indifference to the rights, safety and/or welfare of Plaintiffs and others.  Based on the facts stated herein, such gross negligence and/or malice constitutes a proximate and producing cause of Plaintiffs' damages and Plaintiffs

therefore request that exemplary damages be awarded to Plaintiffs.

## XII.

## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

12.1    Plaintiffs seek pre-judgment and post-judgment interest as allowed by law.

## XIII.

## CONDITIONS PRECEDENT

13.1    All conditions precedent have been performed or have occurred.

## XIV.

## JURY DEMAND

14.1    Plaintiffs respectfully request a trial by jury.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs Catarina Anciso Montemayor, Individually and as Representative of the Estate of Antonio Montemayor respectfully pray that Defendants The Toro Company, Toro Manufacturing LLC, and Lowe's Companies, Inc. be cited to appear and answer herein, and that after a final hearing of this Cause, judgment be entered for Plaintiffs against Defendants for damages in an amount within the jurisdictional limits of the Court, together with prejudgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law, post judgment interest at the legal rate, costs of Court, and such other and further relief to which Plaintiffs may be entitled at law or in equity and for which they will ever pray.

Respectfully submitted,

By: /s/ Douglas E. Chaves
Douglas E. Chaves
State Bar No. 04161400
Southern District Bar No. 1895
E-mail:  dchaves@coplawfirm.com
***Attorney-In-Charge***

Aidan Perales
State Bar No. 24027604
Southern District Bar No. 27471
aperales@coplawfirm.com

CHAVES, OBREGON & PERALES, LLP
555 N. Carancahua, Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 884-5400
Telecopier: (361) 884-5401

**ATTORNEYS FOR PLAINTIFFS
CATARINA ANCISO MONTEMAYOR,
INDIVIDUALLY, AND AS THE PERSONAL
REPRESENTATIVE OF THE ESTATE OF
ANTONIO MONTEMAYOR**

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that a copy of the foregoing instrument has been served upon all counsel of record to this proceeding by the manner indicated below, on this 11th day of June 2025.

                                    /s/ Douglas E. Chaves
                                    DOUGLAS E. CHAVES

<u>*Via e-serve*</u>
**KILPATRICK, TOWNSEND & STOCKTON LLP**
KIRK T. FLORENCE
Attorney -in-charge
Texas Bar No. 07160900
S.D. Tex. Bar No. 19146
ZOE STENDARA
Texas Bar No. 24122986
S.D. Tex. Bar No. 3690389
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7100
(214)279-9194 facsimile
**ATTORNEYS FOR DEFENDANTS**
**THE TORO COMPANY,**
**TORRO MANUFACTURING LLC and**
**LOWE'S COMPANIES, INC.**

**NOTICE OF ELECTRONIC FILING**

     I HEREBY CERTIFY that I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States District Court for the Southern District of Texas on the 11TH day of June, 2025.

                               /s/ Douglas E. Chaves
                               Attorney- In Charge